# EXHIBIT A

# Series D Preferred
# Stock Purchase Agreement

**SERIES D PREFERRED STOCK PURCHASE AGREEMENT (EXTENSION)**

**By and Among**

**Twist Bioscience Corporation**

**and**

**The Investors**

**as defined herein**

**Dated as of March 9 , 2017**

OHSUSA:766343376.7

### SERIES D PREFERRED STOCK PURCHASE AGREEMENT (EXTENSION)

**This SERIES D PREFERRED STOCK PURCHASE AGREEMENT (EXTENSION)** (this "Agreement") is made as of March 9 , 2017, by and among Twist Bioscience Corporation, a Delaware corporation (the "Company") and the investors listed on the signature pages hereto (collectively, the "Investors").

**WHEREAS**, the Company has agreed to sell, and the Investors have agreed to purchase, up to an aggregate of 23,302,418 shares of the Company's Series D Preferred Stock, par value $0.00001 per share (the "Shares") in accordance with the terms and provisions hereof.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## ARTICLE I - PURCHASE AND SALE OF SHARES

**1.1.** **Purchase and Sale of Shares.** Subject to the terms and conditions of this Agreement and in reliance on the representations, warranties and covenants herein set forth:The Company shall issue and sell to the Investors, and each such Investor severally and not jointly agrees to purchase from the Company, the respective number of shares of Series D Preferred Stock set forth opposite the name of such Investor on Schedule A hereto at a purchase price of $2.1457 per share.

(b) The Series D Preferred Stock issued pursuant to this Agreement shall have the rights, preferences and other terms set forth in the Amended and Restated Certificate of Incorporation of the Company (the "Certificate") attached as Exhibit A hereto.

**1.2.** **Closing; Delivery.** Subject to the satisfaction or waiver of the conditions set forth herein, the purchase and sale of the Shares shall be made at a closing to be held on the date hereof (the "Initial Closing"), upon the physical or electronic exchange among the parties and their counsel of all documents and deliverables required under this Agreement. In the event there is more than one closing, the term "Closing" shall apply to each such closing unless otherwise specified herein. At each Closing, the Company will deliver to each applicable Investor one or more certificates representing the Shares purchased by such Investor as set forth on Schedule A hereto against payment of the purchase price relating thereto to the Company by wire transfer payable in immediately available funds in accordance with the wire transfer instructions set forth on Schedule B, or by certified or bank check made payable to the Company. If fewer than 23,302,418 shares of Series D Preferred Stock are sold at the Initial Closing, the Company shall have the right, any time prior to the earlier of (i) the first anniversary of the Initial Closing and (ii) the first filing by the Company of a confidential Form S-1 registration statement, to sell such remaining shares of Series D Preferred Stock to one or more additional purchasers as determined by the Company, or to any Investor hereunder who wishes to acquire additional shares of Series D Preferred Stock at the price and on the terms set forth herein, provided that any such additional purchaser shall (i) become a party to this Agreement and the related Transaction Documents (as defined in Section 2.1 below), and (ii) have the rights and obligations hereunder and thereunder, by executing and delivering to the Company counterpart signature page to this Agreement and an additional counterpart signature page to each of the other Transaction Documents. Any additional purchaser so acquiring shares of Series D Preferred Stock shall be considered an "Investor" for purposes of this Agreement, and any Series D Preferred Stock so acquired by such additional purchaser shall be considered "Shares" for purposes of this Agreement and all other agreements contemplated hereby.

1

    **1.3.**   <u>Use of Proceeds</u>.  Proceeds from the investment will be used for recruiting, product development and commercialization, working capital and general corporate purposes.

**ARTICLE II - REPRESENTATIONS AND WARRANTIES OF THE COMPANY**

    In order to induce the Investors to enter into this Agreement and consummate the transactions contemplated hereby, the Company hereby makes to the Investors the following representations and warranties as of the Initial Closing Date.  For purposes of these representations and warranties (other than those in Sections 2.1, 2.2, 2.3, and 2.4), the term "Company" shall include any subsidiaries of the Company, unless otherwise noted herein.

    **2.1.**   <u>Organization and Corporate Power</u>.  The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.  The Company has all requisite corporate power and authority to own its properties, to carry on its business as presently conducted, to enter into and perform this Agreement and the agreements, documents and instruments contemplated hereby, including the Stockholders Agreement (as defined below) and the Registration Rights Agreement (as defined below) (collectively, the "<u>Transaction Documents</u>") to which it is a party and to carry out the transactions contemplated hereby and thereby.  The Company is duly licensed and is in good standing in each jurisdiction in which the failure to so qualify would have a material adverse effect on the assets, liabilities, condition (financial or other), business, or results of operations of the Company (a "<u>Material Adverse Effect</u>").

    **2.2.**   <u>Authorization and Non-Contravention</u>.  The Transaction Documents are valid and binding obligations of the Company, enforceable in accordance with their terms, except as enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or similar laws, from time to time in effect, which affect enforcement of creditors' rights generally.  The execution, delivery and performance of the Transaction Documents, the sale and delivery of the Shares in accordance with this Agreement and, if converted in accordance with the Certificate, the issuance of the Common Stock received upon conversion of the Preferred Stock (the "<u>Conversion Shares</u>"), have been duly authorized by all necessary corporate or other action of the Company and its stockholders.  The execution, delivery and performance of the Transaction Documents to which the Company is a party, including, without limitation, the sale and delivery of the Shares in accordance with this Agreement and, if the Shares are converted, the issuance of the Conversion Shares in accordance with the Certificate and the performance of any transactions contemplated by the Transaction Documents will not (i) violate, conflict with or result in a default (whether after the giving of notice, lapse of time or both) under any contract or obligation to which the Company is a party or by which it or its assets are bound, or any provision of the Certificate or the by-laws of the Company (the "<u>By-laws</u>"), or cause the creation of any lien or encumbrance upon any of the assets of the Company; (ii) violate, conflict with or result in a default (whether after the giving of notice, lapse of time or both) under, any provision of any law, regulation or rule, or any order of, or any restriction imposed by any court or other governmental agency applicable to the Company; (iii) require from the Company any notice to, declaration or filing with, or consent or approval of any governmental authority or other third party other than pursuant to federal or state securities or blue sky laws; or (iv) accelerate any material obligation under, or give rise to a right of termination of, any agreement, permit, license or authorization to which the Company is a party or by which it is bound.

    **2.3.**   <u>Authorized and Outstanding Stock</u>.  Immediately prior to the consummation of the transactions to be effected at the Initial Closing, the authorized capital stock of the Company will consist of (i) 193,128,848 shares of its common stock, par value $0.00001 per share (the "Common Stock"), of

2

which 30,679,861 shares are issued and outstanding, and (ii) 138,580,359 shares of Preferred Stock, of which 28,263,133 shares have been designated Series A Preferred Stock (the "Series A Preferred Stock"), of which 27,898,391 shares are issued and outstanding prior to the Initial Closing, 32,988,887 shares have been designated Series B Preferred Stock (the "Series B Preferred Stock"), of which 32,828,281 shares are issued and outstanding prior to the Initial Closing, 24,854,989 shares have been designated Series C Preferred Stock (the "Series C Preferred Stock"), of which 24,668,310 are issued and outstanding prior to the Initial Closing, and 52,473,350 shares have been designated Series D Preferred Stock (the "Series D Preferred Stock"), 29,096,365 of which are issued and outstanding prior to the Initial Closing. Immediately prior to the consummation of the transactions contemplated hereby, the outstanding shares of capital stock of the Company will be held beneficially and of record by the persons identified in Schedule 2.3 in the amounts indicated thereon. Schedule 2.3 sets forth the name of each holder of options and warrants for Common Stock, the number of shares for which such options and warrants are exercisable with respect to each holder, along with the applicable vesting schedule, if any, and the exercise price. Except as disclosed in Schedule 2.3 and in the Transaction Documents, there are no outstanding subscriptions, options, warrants, phantom rights, commitments, agreements, arrangements or commitments of any kind for or relating to the issuance, or sale of, or outstanding securities convertible into or exchangeable for, any shares of capital stock of any class or other equity interests of the Company. Except as set forth in Schedule 2.3, the Company has no obligation to purchase, redeem, or otherwise acquire any of its capital stock or any interests therein. After giving effect to the transactions contemplated hereby, all of the outstanding shares of capital stock of the Company will have been duly and validly authorized and issued and will be fully paid and non-assessable. Immediately after the Initial Closing the outstanding shares of capital stock of the Company will be held beneficially and of record by the persons identified in Schedule 2.3(a) in the amounts indicated thereon. The offer, issuance, sale and delivery of the Shares and Conversion Shares are or will be exempt from the registration requirements of the Securities Act of 1933, as amended (the "Act") and the qualification or registration provisions of applicable state securities laws, assuming the truth and accuracy of the Investors' representations and warranties set forth in Article III hereof. Neither the Company nor its authorized agents will take any action that would cause the loss of such exemption. The Company has duly and validly authorized and reserved 138,580,359 shares of Common Stock for issuance upon conversion of the Preferred Stock and the Conversion Shares so issued in accordance with the Certificate will, upon such conversion and issuance, be validly issued, fully paid and non-assessable. The relative rights, preferences and other terms relating to the Preferred Stock are as set forth in the Certificate, and such rights and preferences are valid and enforceable under Delaware law. There are no preemptive rights, rights of first refusal, put or call rights or obligations or anti-dilution rights with respect to the issuance, sale or redemption of the Company's capital stock, other than rights set forth herein or in the Certificate, the Stockholders Agreement or the Registration Rights Agreement. Other than the rights set forth in the Transaction Documents or in Schedule 2.3, there are no rights to have the Company's capital stock registered for sale to the public pursuant to the laws of any jurisdiction, and, to the Company's knowledge, there are no agreements, other than the Transaction Documents, relating to the voting of the Company's voting securities or restrictions on the transfer of the Company's capital stock.

**2.4.    Subsidiaries**.  The Company does not own or control, directly or indirectly, any interest in any other corporation, partnership, limited liability company, association or other business entity.

**2.5.    Financial Statements.**

The Company has delivered to each Investor its unaudited financial statements (balance sheet and income and cash flow statements) at and for the fiscal year ended September 30, 2016 (the "Financial Statements") and for the three month period ended December 31, 2016. The Financial Statements have been prepared in accordance with generally accepted accounting principles applied on a consistent basis

3

throughout the periods indicated and with each other, except that the Financial Statements may not contain all footnotes required by generally accepted accounting principles. The Financial Statements fairly present the financial condition and operating results of the Company as of the dates, and for the periods, indicated therein, subject to normal year-end audit adjustments. Except as set forth in the Financial Statements, the Company has no material liabilities, contingent or otherwise, other than (a) liabilities incurred in the ordinary course of business subsequent to December 31, 2016 (the "Financial Statement Date") and (b) obligations under contracts and commitments incurred in the ordinary course of business and not required under generally accepted accounting principles to be reflected in the Financial Statements, which, in both cases, individually or in the aggregate, are not material to the financial condition or operating results of the Company. Except as disclosed in the Financial Statements, the Company is not a guarantor or indemnitor of any indebtedness of any other person, firm or corporation. The Company maintains and will continue to maintain a standard system of accounting established and administered in accordance with generally accepted accounting principles.

2.6.    **Changes**.  Since the Financial Statement Date there has not been:

(a)     any change in the assets, liabilities, financial condition or operating results of the Company from that reflected in the Financial Statements, except changes in the ordinary course of business that have not been, in the aggregate, materially adverse;

(b)     any damage, destruction or loss, whether or not covered by insurance, materially and adversely affecting the assets, properties, financial condition, operating results, prospects or business of the Company (as such business is presently conducted and as it is proposed to be conducted);

(c)     any waiver by the Company of a valuable right or of a material debt owed to it;

(d)     any satisfaction or discharge of any lien, claim or encumbrance or payment of any obligation by the Company, except in the ordinary course of business and that is not material to the assets, properties, financial condition, operating results or business of the Company (as such business is presently conducted and as it is proposed to be conducted);

(e)     any material change or amendment to a material contract or arrangement by which the Company or any of its assets or properties is bound or subject;

(f)     any material change in any compensation arrangement or agreement with any employee, officer, director or stockholder;

(g)     any sale, assignment or transfer of any patents, trademarks, copyrights, trade secrets or other intangible assets;

(h)     any resignation or termination of employment of any key officer of the Company; and the Company, to its knowledge, does not know of the impending resignation or termination of employment of any such officer or key employee;

(i)     receipt of notice that there has been a loss of, or material order cancellation by, any major customer of the Company;

(j)     any mortgage, pledge, transfer of a security interest in, or lien, created by the Company, with respect to any of its material properties or assets, except liens for taxes not yet due or

4

payable and liens that arise in the ordinary course of business and do not materially impair the Company's ownership or use of such property or assets;

(k)      any loans or guarantees made by the Company to or for the benefit of its employees, officers or directors, or any members of their immediate families, other than travel advances and other advances made in the ordinary course of its business;

(l)      any declaration, setting aside or payment or other distribution in respect of any of the Company's capital stock, or any direct or indirect redemption, purchase or other acquisition of any of such stock by the Company;

(m)      to the Company's knowledge, any other event or condition of any character that might materially and adversely affect the assets, properties, financial condition, operating results or business of the Company (as such business is presently conducted and as it is proposed to be conducted); or

(n)      any agreement or commitment by the Company to do any of the things described in this Section 2.6.

2.7.    **Litigation**.  Except as set forth on <u>Schedule 2.7</u>, there is no action, suit, litigation, proceeding or investigation pending or, to the knowledge of the Company, threatened, by or against the Company or affecting any of the Company's properties, assets, condition, the rights of the Company to enter into this Agreement, the Transaction Documents or the transactions contemplated hereby or thereby, or that questions the validity of the Transaction Documents, or, to the knowledge of the Company, against any officer, key employee or stockholder of the Company in his or her capacity as such.  The Company is not a party or subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality.

2.8.    **Title to Properties.**  <u>Schedule 2.8</u> lists all (i) material real property and (ii) material personal property not owned by the Company, in each case used in or necessary to the conduct of the Company's business.  The Company has good and marketable title of record to all of its owned real property and a valid and enforceable leasehold interest in all of its material leased real property, free and clear of all liens, restrictions and encumbrances.  The material personal property used in the business of the Company is in good condition and repair in all material respects (ordinary wear and tear excepted).

2.9.    **Intellectual Property**.

(a)      <u>Schedule 2.9</u> contains a complete and accurate list of all Patents owned by the Company or to the Company's knowledge otherwise used in the Business ("<u>Company Patents</u>"), Marks owned by the Company or otherwise used in the Business ("<u>Company Marks</u>") and registered Copyrights or applications therefor owned by the Company or otherwise used in, and in either case, material to the Business ("<u>Company Copyrights</u>").  Except as set forth on <u>Schedule 2.9</u>:

(i)      the Company exclusively owns or possesses adequate and enforceable rights to use, or can acquire on commercially reasonable terms, all of the Intellectual Property Assets material to the operation of the Business, free and clear of all mortgages, pledges, charges, liens, equities, security interests, or other encumbrances or similar agreements (together "<u>Restrictions</u>"), in each case other than Restrictions that Company does not expect to materially impact its ability to operate the Business;

5

(ii) to Company's knowledge, all Company Patents, Company Marks and Company Copyrights which are issued by or registered with, as applicable, the U.S. Patent and Trademark Office, the U.S. Copyright Office or in any similar office or agency anywhere in the world, are currently in compliance with formal legal requirements (including without limitation, as applicable, payment of filing, examination and maintenance fees, proofs of working or use, timely post-registration filing of affidavits of use and incontestability and renewal applications) and  to Company's knowledge, such Company Patents, Company Marks and Company Copyrights are valid and enforceable;

(iii) there are no pending, or, to the Company's knowledge, threatened claims against the Company or any of its employees alleging that any of the Company Intellectual Property Assets, Products or the Business, infringes or conflicts with the rights of others under any Intellectual Property Assets ("Third Party Rights");

(iv) to the Company's knowledge, none of the Products, the Business nor any Company Intellectual Property Asset infringes or conflicts with any Third Party Rights;

(v) the Company has not received any written communications alleging that the Company has violated or, by conducting the Business, would violate any Third Party Rights or that any of the Company Intellectual Property Assets is invalid or unenforceable;

(vi) no current or former employee or consultant of the Company owns any rights in or to any of the Company Intellectual Property Assets, in each case that the Company owns or purports to own;

(vii) the Company is not aware of any violation or infringement by a third party of any of the Company Intellectual Property Assets in each case that the Company owns or purports to own;

(viii) the Company has taken reasonable security measures to protect the secrecy, confidentiality and value of all Trade Secrets used in the Business (the "Company Trade Secrets"), including, without limitation, requiring all Company employees and consultants and all other persons with access to Company Trade Secrets to execute a binding confidentiality agreement, copies or forms of which have been provided to the Investors and, there has not been any breach by the Company, or to the knowledge of the Company, any other party to such confidentiality agreements;

(ix) (A) the Company has not directly or indirectly granted any rights, licenses options, shared ownership interests, other encumbrances or interests in the Products or any Company Intellectual Property Assets except in the ordinary course of Business, and (B) the Company has not provided or disclosed the source code of the Products in a non-confidential manner to any person or entity;

(x) to the Company's knowledge, the Company has complied with all applicable regulations relating to the collection, storage and onward transfer of all personally identifiable information collected by the Company or by third parties having authorized access to Company's databases or other records;

(xi) with respect to Company Intellectual Property Assets arising out of work supported by grants or contracts from the government or others, the Company has made all disclosures required to be made by the Company to the relevant granting entities and completed all requirements

6

applicable to the Company for asserting and obtaining ownership of all Intellectual Property Assets to the extent required by law or contract; and

(xii)    neither the Company, nor, to its knowledge, any employee or independent contractor of the Company, is in possession of documentation including, or is using in the context of the Business, any Trade Secrets or other confidential business or technical information of any other person or entity for which such employee or independent contractor formerly performed services as an employee or independent contractor, in each case not generally known to the public and acquired by such persons in connection with the performance of services for such person or entity.

(b)    For purposes of this Agreement,

(i)    "Business" means the business of the Company as currently conducted and as proposed to be conducted through December 31, 2017.

(ii)    "Company Intellectual Property Assets" means all Intellectual Property Assets owned by the Company or used in the Business.  "Company Intellectual Property Assets" includes, without limitation, the Products, Company Patents, Company Marks, Company Copyrights and Company Trade Secrets.

(iii)    "Intellectual Property Assets" means:

(A)    Patents (including United States and foreign patents and utility models), patent applications (including provisional applications), patent rights, and inventions and discoveries and invention disclosures or other documentation of inventions or discoveries (whether or not patented), and any and all divisions, continuations, continuations-in-part, reissues, revisions, reexaminations and extensions thereof (collectively, "Patents");

(B)    trade names, trade dress, logos, packaging design, slogans, Internet domain names, registered and unregistered trademarks and service marks, including all good will associated therewith, and related registrations and applications for registration, and all renewals in connection therewith (collectively, "Marks");

(C)    copyrights in both published and unpublished works, including without limitation all compilations, databases and computer programs, manuals and other documentation and all copyright registrations and applications and renewals in connection therewith, and all derivatives, translations, adaptations and combinations of the above (collectively, "Copyrights");

(D)    know-how, trade secrets, confidential or proprietary information, research in progress, algorithms, data, designs, processes, formulae, drawings, schematics, blueprints, flow charts, models, strategies, prototypes, techniques, beta testing routines and procedures and beta testing results (collectively, "Trade Secrets"); and

(E)    goodwill, franchises, licenses, permits, consents, approvals, and claims of infringement against third parties.

(iv)    "Products" means those computer programs, products, services, kits, nucleic acids, reagents, silicon substrates or reactor vessels, devices, instruments and other physical products and related documentation designed, manufactured, marketed, used, sold and/or distributed by

7

the Company, or planned to be designed, manufactured, marketed, used, sold and/or distributed by the Company through December 31, 2017.

**2.10.** **Certain Contracts and Arrangements**. Except as set forth in the Transaction Documents or in Schedule 2.10 (with true and correct copies provided to the Investors), the Company is not a party or subject to or bound by:

(a) any contract or agreement (i) involving a potential commitment or payment by the Company in excess of $100,000 or (ii) which is otherwise material and not entered into in the ordinary course of business;

(b) any employment contracts, noncompetition agreements or other agreements with present or former officers, directors, employees or stockholders of the Company or persons related to or affiliated with such persons;

(c) any agreement to sell, exchange or otherwise dispose of any of its assets or rights, other than the sale of its inventory in the ordinary course of business;

(d) any stock redemption or purchase agreements or other agreements affecting or relating to the capital stock of the Company, including, without limitation, any agreement with any stockholder of the Company which includes anti-dilution rights, registration rights, voting arrangements, operating covenants or similar provisions; or

(e) any pension, profit sharing, bonus, retirement, severance or stock option plans.

All contracts, agreements and instruments set forth on Schedule 2.10 are valid and are in full force and effect and constitute legal, valid and binding obligations of the Company and, to the knowledge of the Company, of the other parties thereto, and are enforceable in accordance with their respective terms. Neither the Company nor, to the knowledge of the Company, any other party, is in default in complying with any provisions of any such contract, agreement, lease or instrument.

**2.11.** **Governmental Approvals; Compliance with Laws**. The Company is, and for the previous two years has been, in compliance in all material respects with all applicable laws and regulations. The Company has all of the material permits, licenses, orders, franchises and other rights and privileges of all federal, state, local or foreign governmental or regulatory bodies necessary for the Company to conduct its business as presently conducted and as contemplated to be conducted. All such material permits, licenses, orders, franchises and other rights and privileges are in full force and effect and, to the knowledge of the Company, no suspension or cancellation of any of them is threatened.

None of the Company, the Company's officers or directors or, to the Company's knowledge, any holders of 5% or more of the Company's securities has:

(a) Filed a petition under the federal bankruptcy laws or any state insolvency law or had a filing against, or had a receiver, fiscal agent or similar officer appointed by a court for the business or property of such person, or any partnership in which he or it was a general partner;

(b) Been convicted in a criminal proceeding or been a named subject of a pending criminal proceeding (excluding traffic violations and other minor offenses);

8

(c)     Been the subject of any order, judgment, or decree, not subsequently reversed, suspended or vacated, of any court of competent jurisdiction, permanently or temporarily enjoining him from, or otherwise limiting, the following activities:

(i)     Acting as a futures commission merchant, introducing broker, commodity trading advisor, commodity pool operator, floor broker, leverage transaction merchant, any other person regulated by the Commodity Futures Trading Commission (the "CFTC"), or an associated person of any of the foregoing, or as an investment adviser, underwriter, broker or dealer in securities, or as an affiliated person, director or employee of any investment company, bank, savings and loan association or insurance company, or engaging in or continuing any conduct or practice in connection with such activity;

(ii)    Engaging in any type of business practice; or

(iii)   Engaging in any activity in connection with the purchase or sale of any security or commodity or in connection with any violation of federal or state securities laws or federal commodities laws;

(d)     Been the subject of any order, judgment or decree, not subsequently reversed, suspended or vacated, of any federal or state authority barring, suspending or otherwise limiting for more than 60 days the right of such person to engage in any activity described in paragraph (c)(i), or to be associated with persons engaged in any such activity; or

(e)     Been found by a court of competent jurisdiction in a civil action or by the SEC or the CFTC to have violated any federal or state securities law, or any federal commodities law and the judgment in such civil action or finding by the SEC or CFTC has not been subsequently reversed, suspended, or vacated.

**2.12.    Employee Matters; ERISA**.  Except as set forth on Schedule 2.12, the Company does not have in effect any employment agreements, consulting agreements, deferred compensation, pension or retirement agreements or arrangements, bonus, severance, incentive or profit-sharing plans or arrangements, or labor or collective bargaining agreements, written or oral.  Upon termination of the employment of any employees, the Company will not be obligated to provide advance notice of termination of employment or be liable to any such employees for any payments in the nature of "severance pay" or retiree health benefits.  The Company is in material compliance with the terms of all plans, programs and agreements listed on Schedule 2.12, and each such plan, program or agreement is in compliance with all of the requirements and provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  No such plan, or program has engaged in any "prohibited transaction" as defined in Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), or has incurred any "accumulated funding deficiency" as defined in Section 302 of ERISA, nor has any reportable event as defined in Section 4043(b) of ERISA occurred with respect to any such plan or program.  The Company has never maintained, sponsored or contributed to any plan which is subject to Title IV of ERISA or Section 412 of the Code.

**2.13.    No Brokers or Finders**.  No person has or will have, as a result of the transactions contemplated by this Agreement, any right, interest or claim against or upon the Company for any commission, fee or other compensation as a finder or broker because of any act or omission by the Company or its stockholders or its affiliates.

9

**2.14.**   **Disclosure**.  The Company has fully provided each Investor with all the information that such Investor has requested for deciding whether to purchase the Shares. No certificates made or delivered in connection with this Agreement or the Transaction Documents contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements herein or therein not misleading.

**2.15.**   **Transactions with Affiliates**.  Except as set forth on Schedule 2.15, there are no loans, leases or other continuing arrangements between the Company on the one hand, and any officer, director or stockholder of the Company or any respective family member or affiliate of such officer, director or stockholder on the other hand.

**2.16.**   **Permits**.  The Company has all franchises, permits, licenses, and any similar authority necessary for the conduct of its business as now being conducted by it and as proposed to be conducted, the lack of which could materially and adversely affect the business, properties or financial condition of the Company.  The Company is not in default in any material respect under any of such franchises, permits, licenses, or other similar authority

**2.17.**   **Confidential Information and Invention Assignment Agreements.**  Each present and former employee and officer of the Company has executed a Confidential Information and Invention Assignment Agreement, and each consultant to the Company has executed a Consulting Agreement, in substantially the forms provided to special counsel for the Investors.  No current or former employee has expressly excluded works or inventions or other subject matter from his or her Proprietary Information and Inventions Agreement.  The Company is not aware that any of its present and former employees, officers or consultants are in violation thereof, and the Company will use its commercially reasonable efforts to prevent any such violation.

**2.18.**   **Tax Matters.**  The Company is and always has been a C corporation.  The Company has filed all of its tax returns and tax reports as required by law.  These tax returns and tax reports are true, complete, and correct in all material respects.  The Company has paid all taxes due and owing, whether or not disputed.  None of the Company's tax returns have ever been audited by a taxing authority, for which the Company received notice thereof.  There are in effect no waivers of applicable statutes of limitations with respect to taxes of the Company for any year.  The Company has properly withheld and paid to the applicable governmental agencies all taxes required to have been withheld and paid in connection with any amounts paid or credited to any employee, independent contractor, creditor, stockholder or other third party. The Company does not have any liabilities for taxes of any other person or entity by contract, as a transferee or successor, under U.S. Treasury Regulation Section 1.1502-6 or analogous state, county, local or foreign provision or otherwise. No claim has ever been made to the Company by any governmental agency in a jurisdiction where the Company does not file tax returns that the Company is or may be subject to taxation by that jurisdiction.

**2.19.**   **Disqualification**.  The Company is not disqualified from relying on Rule 506 of Regulation D ("Rule 506") under the Act for any of the reasons stated in Rule 506(d) in connection with the issuance and sale of the Stock to the Investors.  The Company has furnished to each Investor, a reasonable time prior to the date hereof, a description in writing of any matters that would have triggered disqualification under Rule 506(d) but which occurred before September 23, 2013, in each case, in compliance with the disclosure requirements of Rule 506(e).

**2.20.**   **Insurance**.  The Company has in full force and effect fire and casualty insurance policies with extended coverage, sufficient in amount (subject to reasonable deductions) to allow it to replace any of its properties that might be damaged or destroyed.

10

**2.21.** **Corporate Documents**. The Certificate and Bylaws of the Company are in the form provided to the Investors. The minutes and consents of the Company's Board of Directors and stockholders provided to the Investors are minutes of all meetings of directors and stockholders and all actions by written consent without a meeting by the directors and stockholders since May 13, 2014 and accurately reflect in all material respects all actions by the directors (and any committee of directors) and stockholders with respect to all transactions referred to in such minutes.

**2.22.** **83(b) Elections.** All elections and notices under Section 83(b) of the Code have been or will be timely filed by all individuals who have acquired unvested shares of the Company's Common Stock.

**2.23.** **Environmental and Safety Laws**. Except as could not reasonably be expected to have a Material Adverse Effect, to the best of its knowledge (a) the Company is and has been in compliance with all Environmental Laws; (b) there has been no release or, to the Company's knowledge, threatened release of any pollutant, contaminant or toxic or hazardous material, substance or waste or petroleum or any fraction thereof (each a "Hazardous Substance"), on, upon, into or from any site currently or heretofore owned, leased or otherwise used by the Company; (c) there have been no Hazardous Substances generated by the Company that have been disposed of or come to rest at any site that has been included in any published U.S. federal, state or local "superfund" site list or any other similar list of hazardous or toxic waste sites published by any governmental authority in the United States; and (d) there are no underground storage tanks located on, no polychlorinated biphenyls ("PCBs") or PCB-containing equipment used or stored on, and no hazardous waste as defined by the Resource Conservation and Recovery Act, as amended, stored on, any site owned or operated by the Company, except for the storage of hazardous waste in compliance with Environmental Laws. The Company has made available to the Investors true and complete copies of all material environmental records, reports, notifications, certificates of need, permits, pending permit applications, correspondence, engineering studies and environmental studies or assessments. "Environmental Laws" means any law, regulation, or other applicable requirement relating to (a) releases or threatened release of Hazardous Substance; (b) pollution or protection of employee health or safety, public health or the environment; or (c) the manufacture, handling, transport, use, treatment, storage, or disposal of Hazardous Substances.

**2.24.** **Foreign Corrupt Practices Act.** Neither the Company nor, to the Company's knowledge, any of the Company's directors, officers, employees or agents have, directly or indirectly, made, offered, promised or authorized any payment or gift of any money or anything of value to or for the benefit of any "foreign official" (as such term is defined in the U.S. Foreign Corrupt Practices Act of 1977, as amended (the "FCPA")), foreign political party or official thereof or candidate for foreign political office for the purpose of (i) improperly influencing any official act or decision of such official, party or candidate, (ii) improperly inducing such official, party or candidate to use his, her or its influence to affect any act or decision of a foreign governmental authority, or (iii) securing any improper advantage, in the case of (i), (ii) and (iii) above in order to assist the Company or any of its affiliates in obtaining or retaining business for or with, or directing business to, any person. Neither the Company nor, to the Company's knowledge, any of its directors, officers, employees or agents have made or authorized any bribe, rebate, payoff, influence payment, kickback or other unlawful payment of funds or received or retained any funds in material violation of any applicable anti-bribery or anti-corruption law, rule or regulation. The Company further represents that, as appropriate, it has maintained, and has caused each of its subsidiaries and affiliates to maintain, systems of internal controls (including, but not limited to, accounting systems, purchasing systems and billing systems) intended to ensure compliance with the FCPA or any other applicable anti-bribery or anti-corruption law. Neither the Company, or, to the Company's knowledge, any of its officers, directors or employees are the subject of any allegation,

11

voluntary disclosure, investigation, prosecution or other enforcement action related to the FCPA or any other applicable anti-corruption law.

2.25.   **Anti-Money Laundering Laws.**  The Company is in compliance with all applicable anti-money laundering statutes, the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any applicable governmental agency (collectively, "Anti-Money Laundering Laws"), and no action, suit, proceeding, investigation or enforcement by or before any court or governmental agency, authority or body or any arbitrator involving the Company with respect to the Anti-Money Laundering Laws is pending, or to the Company's knowledge, threatened.  The Company has instituted and maintain policies and procedures designed to ensure, and which are reasonably expected to continue to ensure, compliance with Anti-Money Laundering Laws.

2.26.   **Data Privacy.**  In connection with its collection, storage, transfer (including, without limitation, any transfer across national borders) and/or use of any personally identifiable information from any individuals, including, without limitation, any customers, prospective customers, employees and/or other third parties (collectively "Personal Information"), the Company is and has been, to the Company's knowledge, in compliance with all applicable laws in all relevant jurisdictions, the Company's privacy policies and the requirements of any contract or codes of conduct to which the Company is a party.  The Company has commercially reasonable physical, technical, organizational and administrative security measures and policies in place to protect all Personal Information collected by it or on its behalf from and against unauthorized access, use and/or disclosure.  The Company is and has been, to the Company's knowledge, in compliance in all material respects with all laws relating to data loss, theft and breach of security notification obligations.  Notwithstanding the foregoing, the Company makes no representation as to compliance with national laws relating to the collection, use and transfer of genetic or biologic material, as may be applicable in foreign jurisdictions, to the extent that such laws impose additional or different obligations distinct from general data privacy laws that exist in such jurisdiction.

2.28.   **No Promotion.**  The Company agrees that it will not, and shall cause each of its Subsidiaries to not, without the prior written consent of Fidelity Management & Research Company ("FMR"), use in advertising, publicity, or otherwise the name of FMR, or any Fidelity Purchaser, or any partner or employee of FMR or any Fidelity Purchaser, nor any trade name, trademark, trade device, service mark, symbol or any abbreviation, contraction or simulation thereof owned by FMR, any Fidelity Purchaser or any of their respective affiliates. The Company further agrees that it shall obtain the written consent of FMR prior to the Company's or any of its Subsidiaries'' issuance of any public statement detailing the purchase of Series D Preferred Stock by any Fidelity Purchaser pursuant to this Agreement.

2.29.   **Investment Company.**  The Company is not, and after the Closing of the sale of the Series D Preferred Stock pursuant to this Agreement, will not be an investment company within the meaning of the Investment Company Act of 1940, as amended.

2.30.   **No Additional Agreements.**  The Company has not entered into any agreement or understanding with any Investor purchasing Preferred Stock with respect to the transactions contemplated by this Agreement other than as specified herein or in one of the Transaction Documents. For the avoidance of doubt, each Investor has the same rights with respect to the purchase of Preferred Stock as each of the other Investors other than as explicitly set forth in herein or in a Transaction Document.

2.31.   **Shell Company.**  The Company is not, and has never been, an issuer identified in Rule 144(i)(1) promulgated under the Securities Act.

12

## ARTICLE III - REPRESENTATIONS AND WARRANTIES OF THE INVESTORS

Each Investor severally hereby represents, warrants and covenants on behalf of itself only that:

**3.1.** **Authorization**.  Such Investor has full power and authority to enter into each of the Transaction Documents.

**3.2.** **Purchase Entirely for Own Account**.  This Agreement is made with such Investor in reliance upon such Investor's representation to the Company, which by such Investor's execution of this Agreement such Investor hereby confirms, that the Preferred Stock to be received by such Investor and the Conversion Shares to be received upon conversion of the Shares (collectively, the "Securities") will be acquired for investment for such Investor's own account (or the account of its affiliates), not as a nominee or agent, and not with a view to the resale or distribution of any part thereof in violation of any applicable law, and that such Investor has no present intention of selling, granting any participation in or otherwise distributing the same to any other person.  By executing this Agreement, such Investor further represents that such Investor does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participation to such person or to any third person, with respect to any of the Securities.

**3.3.** **Disclosure of Information**.  Such Investor represents that it has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Preferred Stock and the business, properties and financial condition of the Company.  The foregoing, however, does not limit or modify the representations and warranties of the Company in Article II of this Agreement or the right of the Investors to rely thereon.

**3.4.** **Investment Experience**.  Such Investor is an investor in securities of companies in the development stage and acknowledges that it is able to fend for itself, can bear the economic risk of its investment, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in the Preferred Stock.  If other than an individual, such Investor also represents it has not been organized for the purpose of acquiring the Preferred Stock.

**3.5.** **Accredited Investor**.  Such Investor is an "accredited investor" within the meaning of SEC Rule 501 of Regulation D, as presently in effect.

**3.6.** **Restricted Securities**.  Such Investor understands that the Securities it is purchasing are characterized as "restricted securities" under the federal securities laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that under such laws and applicable regulations such Securities may be resold without registration under the Act only in certain limited circumstances.  In the absence of any effective registration statement covering the Securities or an available exemption from registration under the Act, the Preferred Stock (and any Conversion Shares issued on conversion thereof) must be held indefinitely.  In this connection, such Investor represents that it is familiar with Rule 144, as presently in effect, and understands the resale limitations imposed thereby and by the Act, including without limitation the Rule 144 condition that current information about the Company be available to the public.  Such Investor acknowledges that such information is not now available and the Company has no present plans to make such information available.

**3.7.** **Authority and Non-Contravention**.  The Transaction Documents are valid and binding obligations of such Investor, enforceable in accordance with their terms, except as enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or similar laws, from time to time in effect, which affect enforcement of creditors' rights generally.  The execution, delivery and

13

performance of the Transaction Documents have been duly authorized by all necessary corporate or other action of such Investor.  The execution, delivery and performance of this Agreement and the performance of any transactions contemplated by the Transaction Documents will not (i) violate, conflict with or result in a default (whether after the giving of notice, lapse of time or both) under any material contract or obligation to which such Investor is a party or by which their or its assets are bound, or any provision of such Investor's organizational documents, or cause the creation of any encumbrance upon any of the material assets of such Investor; (ii) violate, conflict with or result in a default (whether after the giving of notice, lapse of time or both) under, any provision of any law, regulation or rule, or any order of, or any restriction imposed by any court or other governmental agency applicable to the Investor; (iii) require from such Investor any notice to, declaration or filing with, or consent or approval of any governmental authority or other third party other than pursuant to federal or state securities or blue sky laws; or (iv) accelerate any obligation under, or give rise to a right of termination of, any agreement, permit, license or authorization to which such Investor is a party or by which it is bound.

> **3.8.    Investment Banking; Brokerage Fees**.  Such Investor has not incurred or taken any action so that the Company is liable for or become liable for any investment banking fees, brokerage commissions, broker's or finder's fees or similar compensation (exclusive of professional fees to lawyers and accountants) in connection with the transactions contemplated by this Agreement.

> **3.9.    Sole Purpose Entity.**  Each Investor which is an entity that was formed for the sole purpose of purchasing the Securities and any other securities of the Company shall be deemed to make each of the representations and warranties contained in this Section 3 with respect to each individual stockholder, member, partner or other equity holder of such Investor (each, an "Indirect Investor") and shall, as a condition to an investment in such Investor, require each such Indirect Investor to make the representations and warranties contained in this Section 3.

> **3.10.    Disqualification**.  Each Investor who is a Covered Person (as defined below) represents that neither such Investor, nor any person or entity with whom Investor shares beneficial ownership of Company securities, is subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the Securities Act of 1933, as amended.  For purposes of this Section 2.6, "Covered Person" means any person or entity set forth in the first paragraph of Rule 506(d)(1). Each Investor who is a Covered Person also agrees, upon request of the Company, to inform the Company if such Investor or any person or entity with whom such Investor shares beneficial ownership of Company securities becomes subject to such disqualifications after the date hereof (so long as Investor or any such person beneficially owns any equity securities of the Company).

> **3.11.    Foreign Investment Regulations.**  Each Investor, other than an Investor that is a registered investment company under the Investment Companies Act of 1940,  represents that, to the knowledge of each Investor, any consideration to be paid for Securities pursuant to this Agreement does not derive from activity that is or was contrary to law or from a person or location that is or was the subject of a United States embargo or other economic sanction and that no consideration to be paid for Securities in accordance with this Agreement will provide the basis for liability for any person under United States anti-money laundering laws or economic sanctions laws.  Each Investor, other than an Investor that is a registered investment company under the Investment Companies Act of 1940, represents that neither such Investor nor any of its nominees or affiliates is on the specially designated OFAC list or similar European Union watch list.

> **3.12.    Exculpation Among Investors.**  Each Investor acknowledges that it is not relying upon any person, firm or corporation, other than the Company and its officers and directors, in making its investment or decision to invest in the Company.  Each Investor agrees that no Investor nor the respective

14

controlling persons, officers, directors, partners, agents, or employees of any Investor shall be liable to any other Investor for any action heretofore or hereafter taken or omitted to be taken by any of them in connection with the purchase of the Securities.

**3.13.** **Legends**.  The Investor understands that the Securities, and any securities issued in respect thereof or exchange therefor, may bear one or all of the following legends:

(a) "THE SECURITIES REFERENCED HEREIN HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF.  NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933."

(b) Any legend set forth in or required by the other Transaction Documents.

(c) Any legend required by the securities laws of any state to the extent such laws are applicable to the Securities or any securities issued in respect thereof or exchange therefor.

## ARTICLE IV - CONDITIONS TO CLOSINGS

**4.1.** **Conditions to the Investors' Obligations at Closing**. The obligations of each of the Investors to purchase and pay for their portion of the Shares shall be subject to fulfillment or waiver on or before the Initial Closing of the following conditions:

(a) <u>Effectiveness of Preferred Stock Terms</u>.  The terms of the Preferred Stock as set forth in <u>Exhibit A</u> hereto shall have become effective by the filing of the Certificate with the Secretary of State of the State of Delaware and a copy of the Certificate certified as of a recent date by the Secretary of State of the State of Delaware shall have been delivered to the Investors.

(b) <u>Representations and Warranties</u>.  The representations and warranties of the Company contained in Article II shall be true on and as of the Initial Closing.

(c) <u>Delivery of Documents</u>. The Company shall have executed and/or delivered to the Investors (or shall have caused to be executed and delivered to the Investors by the appropriate persons) the following:

(i) Copies of resolutions of the Board of Directors and, as applicable, the stockholders of the Company authorizing the execution and delivery of the Transaction Documents and the issuance of the Shares and the Conversion Shares, as certified by the Company's Secretary;

(ii) A copy of the By-Laws of the Company certified by the Company's Secretary;

(iii) Certificates issued by the Secretary of State of the State of Delaware and such states in which the Company is qualified as a foreign corporation, certifying that the Company is in good standing or equivalent status in their respective states;

15

(iv)     The Amendment to the Amended and Restated Stockholders Agreement dated January 8, 2016 (the "Stockholders Agreement") in the form attached hereto as Exhibit B, executed by the Company, a majority-in-interest of the Other Stockholders (as defined in the Stockholders Agreement) and the holders of at least a Majority Interest (as defined in the Stockholders Agreement);

(v)      The Amendment to the Amended and Restated Registration Rights Agreement dated January 8, 2016 (the "Registration Rights Agreement") in the form attached hereto as Exhibit C, executed by the Company, a majority-in-interest of the Other Stockholders (as defined in the Registration Rights Agreement) and the holders of at least a majority of the Shares held by the Existing Preferred Holders (as defined in the Registration Rights Agreement);

(vi)     The amendment of the Company's Equity Incentive Plan increasing the number of shares of Company Common Stock reserved for issuance thereunder to 33,128,101;

(vii)    A legal opinion from Orrick, Herrington & Sutcliffe LLP, counsel to the Company, dated as of the Initial Closing, addressed to the Investors in the form attached hereto as Exhibit D;

(viii)   Confidential Information and Invention Assignment Agreements with each current employee of the Company in substantially the form provided to the Investors;

(ix)     Such other supporting documents and certificates as the Investors may reasonably request.

(d)      No Actions or Proceedings. No action or proceeding by or before any court, administrative body or governmental agency shall have been instituted or threatened which seeks to enjoin, restrain or prohibit, or might result in damages in respect of, this Agreement or the complete consummation of the transactions contemplated by this Agreement, and which would in the reasonable judgment of the Investors make it inadvisable to consummate such transactions.  No law or regulation shall be in effect and no court order shall have been entered in any action or proceeding instituted by any party which enjoins, restrains or prohibits this Agreement or the complete consummation of the transactions contemplated by this Agreement.

(e)      Confidential Information and Employee Stock Purchase Agreements.  Each employee of the Company shall have entered into a Confidential Information and Invention Assignment Agreement, and each consultant to the Company shall have entered into a Consulting Agreement, substantially in the form previously provided or made available to the Investors.  Each holder of Common Stock of the Company shall have entered into a Stock Purchase Agreement in the form previously provided to special counsel for the Investors.

(f)      Bylaws.  The Bylaws of the Company shall provide that the Board of Directors of the Company shall consist of seven (7) persons, which number shall not be changed by an amendment to the Certificate or the Bylaws without consent of a majority of the Preferred Stock.

(g)      Approvals and Consents. The Company shall have made all filings with and notifications of governmental authorities, regulatory agencies and other entities required to be made by them in advance of the Initial Closing in connection with the execution and delivery of this Agreement and the performance by them of the transactions contemplated hereby, and the Investors shall have received copies of all required authorizations, waivers, consents and permits to permit the consummation

OHSUSA:766343376.7

of the transactions contemplated by this Agreement, in form and substance reasonably satisfactory to the Investors, from all third parties.

      **4.2.**   **Conditions of the Company's Obligations at Closing**. The obligations of the Company to each Investor under this Agreement shall be subject to the fulfillment or waiver on or before the Initial Closing, of the following conditions:

          **(a)**   Delivery of Documents. Each Investor shall have executed and/or delivered to the Company (or shall have caused to be executed and delivered to the Company by the appropriate persons) the Transaction Documents and such other documents as may be necessary to consummate the transactions contemplated by this Agreement.

          **(b)**   Performance. All covenants, agreements and conditions contained in this Agreement to be performed by such Investor on or prior to the Initial Closing shall have been performed or complied with in all material respects.

          **(c)**   Approvals and Consents. Each Investor shall have made all filings with and notifications of governmental authorities, regulatory agencies and other entities required to be made by them in advance of the Closing, as applicable, in connection with the execution and delivery of this Agreement and the performance by them of the transactions contemplated hereby, and the Company shall have received copies of all required authorizations, waivers, consents and permits to permit the consummation of the transactions contemplated by this Agreement, in form and substance reasonably satisfactory to the Company, from all third parties.

## ARTICLE V - MISCELLANEOUS

      **5.1.**   **Survival of Representations and Warranties.** The representations, warranties, covenants and agreements made herein or in any certificates or documents executed in connection herewith shall survive the execution and delivery hereof and the Initial Closing for a period of two (2) years following the Initial Closing (with the exception of Section 2.1 (Organization and Corporate Power), Section 2.2 (Authorization and Non-Contravention) and Section 2.3 (Authorized and Outstanding Stock), which shall survive indefinitely) and shall bind the successors and assigns of the relevant party, whether so expressed or not, and all such covenants, agreements, representations and warranties shall inure to the benefit of the successors and assigns of the parties hereto and to transferees of the Shares or shares of Common Stock into which the Shares have been converted, whether so expressed or not.

      **5.2.**   **Entire Agreement.** The Transaction Documents constitute the full and entire understanding and agreement among the parties hereto with respect to the subject matters hereof and thereof, and any and all other written or oral agreements existing prior to or contemporaneously herewith are expressly superseded and canceled.

      **5.3.**   **Amendments, Waivers and Consents.** For the purposes of this Agreement and all agreements, documents and instruments executed pursuant hereto, except as otherwise specifically set forth herein or therein, no course of dealing between the Company on the one hand and any Investor on the other and no delay on the part of any party hereto in exercising any rights hereunder or thereunder shall operate as a waiver of the rights hereof and thereof. Any term or provision hereof may be amended, terminated or waived (either generally or in a particular instance and either retroactively or prospectively) with the written consent of the Company and the holders of at least 70% of the then

17

outstanding Shares, and provided that if any such amendment, termination or waiver adversely affects the rights of an Investor in a manner that is different than the effect on the rights of the other Investors, then such differently affected Investor's written consent shall also be required to effect such amendment, termination or waiver.  Any amendment or waiver effected in accordance with this Section 5.3 shall be binding upon each holder of Shares purchased under this Agreement at the time outstanding (including Conversion Shares into which the Shares have been converted), each future holder of all such securities and the Company.

     **5.4.**    **Notices and Demands.**  All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if faxed (with transmission acknowledgment received), emailed, delivered personally or mailed by certified or registered mail (return receipt requested) as follows:

     (i)     If to the Company, to it at the following address:

> Twist Bioscience Corporation
> 455 Mission Bay Blvd. South
> Suite 545
> San Francisco, CA 94158
> Attention:  Emily Leproust

> with a mandatory copy (which shall not constitute notice) to:

> Orrick, Herrington & Sutcliffe LLP
> 1000 Marsh Road
> Menlo Park, CA 94025
> Telecopy:  (650) 614-7401
> Attention:  John V. Bautista, Esq.

     (ii)     If to any Investor, to it, him or her at the address set forth on the signature page of such Investor hereto, or at such other address as may have been furnished in writing to the Company by such Investor, with a mandatory copy (which shall not constitute notice) to:

> Proskauer Rose LLP
> One International Place
> Boston, MA 02110-2600
> Facsimile: (617) 526-9899
> Email: osolomon@proskauer.com
> Attn: Ori Solomon

Notices shall be effective as of the date of such delivery, mailing, emailing or fax.

     **5.5.**    **Severability.**  Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be deemed prohibited or invalid under such applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, and such prohibition or invalidity shall not invalidate the remainder of such provision or the other provisions of this Agreement.

     **5.6.**    **Expenses.**  The Company shall pay the reasonable fees and expenses of Proskauer Rose LLP, the counsel for the lead Investor, reasonable fees and expenses of experts, consultants and the like

OHSUSA:766343376.7

and other expenses incurred in connection with performing due diligence with respect to the Transaction Documents, and the transactions contemplated thereby, as soon as practicable following the Initial Closing of this Agreement, provided such fees and expenses do not exceed, in the aggregate, $40,000.

  **5.7.**   **Counterparts.** This Agreement and any Exhibit or Schedule hereto may be executed in multiple counterparts, each of which shall constitute an original but all of which shall constitute but one and the same instrument. One or more counterparts of this Agreement or any Exhibit or Schedule hereto may be delivered via telecopier, with the intention that they shall have the same effect as an original counterpart hereof.

  **5.8.**   **Effect of Headings; Construction.** The descriptive headings in this Agreement have been inserted for convenience only and shall not be deemed to limit or otherwise affect the construction of any provision thereof or hereof. The parties have participated jointly in the negotiation and drafting of the Transaction Documents with counsel sophisticated in investment transactions. In the event an ambiguity or question of intent or interpretation arises, this Agreement and the agreements, documents and instruments executed and delivered in connection herewith shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement and the agreements, documents and instruments executed and delivered in connection herewith.

  **5.9.**   **Delays or Omissions.** No delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power or remedy of such non-breaching or non-defaulting party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

  **5.10.**   **Massachusetts Business Trust.** A copy of the Agreement and Declaration of Trust of each Fidelity Purchaser or any affiliate thereof is on file with the Secretary of State of the Commonwealth of Massachusetts and notice is hereby given that this Agreement is executed on behalf of the trustees of such Fidelity Purchaser or any affiliate thereof as trustees and not individually and that the obligations of this Agreement are not binding on any of the trustees, officers or stockholders of such Fidelity Purchaser or any affiliate thereof individually but are binding only upon such Fidelity Purchaser or any affiliate thereof and its assets and property.

  **5.11.**   **Governing Law.** This Agreement shall be deemed a contract made under the laws of Delaware and all disputes, claims or controversies arising out of this Agreement, or the negotiation, validity or performance hereof or the transactions contemplated herein, shall be construed under and governed by the laws of such state, without giving effect to any conflicts of laws principles (whether of the State of Delaware or any other jurisdiction) which would result in the application of the laws of any other jurisdiction.

OHSUSA:766343376.7

5.12.    **Dispute Resolution.**

(a)    All disputes, claims, or controversies arising out of or relating to this Agreement, or any other agreement executed and delivered pursuant to this Agreement, or the negotiation, validity or performance hereof and thereof or the transactions contemplated hereby and thereby, that are not resolved by mutual agreement shall be resolved solely and exclusively by binding arbitration to be conducted before J.A.M.S./Endispute, Inc. ("JAMS") or its successor.  The parties understand and agree that this arbitration provision shall apply equally to claims of fraud or fraud in the inducement.  The arbitration shall be held in San Francisco, California before a single arbitrator and shall be conducted in accordance with the rules and regulations promulgated by JAMS unless specifically modified herein.

The parties covenant and agree that the arbitration shall commence within one hundred twenty (120) days of the date on which a written demand for arbitration is filed by any party hereto.  In connection with the arbitration proceeding, the arbitrator shall have the power to order the production of documents by each party and any third-party witnesses.  In addition, each party may take up to three depositions as of right, and the arbitrator may in his or her discretion allow additional depositions upon good cause shown by the moving party.  However, the arbitrator shall not have the power to order the answering of interrogatories or the response to requests for admission.  In connection with any arbitration, each party shall provide to the other, no later than fourteen (14) business days before the date of the arbitration, the identity of all persons that may testify at the arbitration, a copy of all documents that may be introduced at the arbitration or considered or used by a party's witness or expert, and a summary of the expert's opinions and the basis for said opinions.  The arbitrator's decision and award shall be made and delivered within sixty (60) days of the conclusion of the arbitration.  The arbitrator's decision shall set forth a reasoned basis for any award of damages or finding of liability.  The arbitrator shall not have power to award damages in excess of actual compensatory damages and shall not multiply actual damages or award punitive damages or any other damages that are specifically excluded under this Agreement, and each party hereby irrevocably waives any claim to such damages.

The parties covenant and agree that they will participate in the arbitration in good faith and that they will share equally its costs, except as otherwise provided herein.  The arbitrator may in his or her discretion assess costs and expenses (including the reasonable legal fees and expenses of the prevailing party) against any party to a proceeding.  Any party unsuccessfully refusing to comply with an order of the arbitrators shall be liable for costs and expenses, including attorneys' fees, incurred by the other party in enforcing the award.  This Section 5.11 applies equally to requests for temporary, preliminary or permanent injunctive relief, except that in the case of temporary or preliminary injunctive relief any party may proceed in court without prior arbitration for the limited purpose of avoiding immediate and irreparable harm.  The provisions of this Section 5.11 shall be enforceable in any court of competent jurisdiction.

Subject to the second sentence of the immediately preceding paragraph, the parties shall bear their own attorneys' fees, costs and expenses in connection with the arbitration.  The parties will share equally in the fees and expenses charged by JAMS.

(b)    Each of the parties hereto irrevocably and unconditionally consents to the exclusive jurisdiction of JAMS to resolve all disputes, claims or controversies arising out of or relating to this Agreement or any other agreement executed and delivered pursuant to this Agreement or the negotiation, validity or performance hereof and thereof or the transactions contemplated hereby and thereby and further consents to the jurisdiction of the courts of San Francisco, California for the purposes of enforcing the arbitration provisions of Section 5.11(a) of this Agreement. Each party further irrevocably waives any objection to proceeding before JAMS based upon lack of personal jurisdiction or

20

to the laying of venue and further irrevocably and unconditionally waives and agrees not to make a claim in any court that arbitration before JAMS has been brought in an inconvenient forum.  Each of the parties hereto hereby consents to service of process by registered mail at the address to which notices are to be given.  Each of the parties hereto agrees that its or his submission to jurisdiction and its or his consent to service of process by mail is made for the express benefit of the other parties hereto.

      **5.13.**   <u>**No Commitment for Additional Financing.**</u>  The Company acknowledges and agrees that no Investor has made any representation, undertaking, commitment or agreement to provide or assist the Company in obtaining any financing, investment or other assistance, other than the purchase of the Shares as set forth herein and subject to the conditions set forth herein.  In addition, the Company acknowledges and agrees that (i) no statements, whether written or oral, made by any Investor or its representatives on or after the date of this Agreement shall create an obligation, commitment or agreement to provide or assist the Company in obtaining any financing or investment, (ii) the Company shall not rely on any such statement by any Investor or its representatives and (iii) an obligation, commitment or agreement to provide or assist the Company in obtaining any financing or investment may only be created by a written agreement, signed by such Investor and the Company, setting forth the terms and conditions of such financing or investment and stating that the parties intend for such writing to be a binding obligation or agreement.  Each Investor shall have the right, in its sole and absolute discretion, to refuse or decline to participate in any other financing of or investment in the Company, and shall have no obligation to assist or cooperate with the Company in obtaining any financing, investment or other assistance.

      **5.14.**   <u>**Waiver of Conflicts.**</u>  Each party to this Agreement, other than a party that is a registered investment company under the Investment Companies Act of 1940, acknowledges that Orrick, Herrington & Sutcliffe LLP, counsel for the Company, has in the past performed and may continue to perform legal services for certain of the Investors in matters unrelated to the transactions described in this Agreement, including the representation of such Investors in venture capital financings and other matters.  Accordingly, each party to this Agreement hereby (a) acknowledges that they have had an opportunity to ask for information relevant to this disclosure; and (b) gives its informed consent to Orrick, Herrington & Sutcliffe LLP's representation of certain of the Investors in such unrelated matters and to Orrick, Herrington & Sutcliffe LLP's representation of the Company in connection with this Agreement and the transactions contemplated hereby.

**[SIGNATURE PAGES FOLLOW NEXT]**

OHSUSA:766343376.7

**IN WITNESS WHEREOF**, the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

**COMPANY:**

**TWIST BIOSCIENCE CORPORATION**

By: _____

Name: Emily Leproust

Title: Chief Executive Officer

[Signature Page to Series D Stock Purchase Agreement]

**IN WITNESS WHEREOF**, the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

INVESTORS:

**ALEXANDRIA EQUITIES, LLC,**
a Delaware limited liability company

By: ALEXANDRIA REAL ESTATE EQUITIES, INC.,
a Maryland corporation, managing member

By: _____

Name: Aaron Jacobson

Title: VP - Corporate Counsel

Address for notices:

385 E. Colorado Blvd., Suite 299

Pasadena, CA 91101

Phone: (626) 578-0777

Fax: (626) 578-0770

Email: investments@are.com

956

**IN WITNESS WHEREOF**, the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

**INVESTORS:**

ARCH VENTURE FUND VIII OVERAGE, L.P.

By: ARCH Venture Partners VIII, L.P., its General Partner

By: ARCH Venture Partners VIII, LLC, its General Partner

By: _____
Name: Mark McDonnell
Title: Managing Director

Addresses for notices:

c/o ARCH Venture Partners VIII, L.P.
8755 W. Higgins Road, Suite 1025
Chicago, IL 60631
Attn: Mark McDonnell
Phone: (773) 380-6600
Fax: (773) 380-6606
Email: mmcdonnell@archventure.com

With a mandatory copy, which shall not constitute notice, to:

Proskauer Rose LLP
One International Place
Boston, MA 02110
Attn: Ori Solomon
Phone: (617) 526-9889
Fax: (617) 526-9899
Email: osolomon@proskauer.com

957

IN WITNESS WHEREOF, the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

INVESTORS:

ARCH VENTURE FUND VII, L.P.

By: ARCH Venture Partners VII, L.P., its General Partner

By: ARCH Venture Partners VII, LLC, its General Partner

By: _____

Name: _KEITH CRANDELL_____

Title: __MANAGING DIRECTOR_____

Addresses for notices:

c/o ARCH Venture Partners VII, L.P.
8755 W. Higgins Road, Suite 1025
Chicago, IL 60631
Attn: Mark McDonnell
Phone: (773) 380-6600
Fax: (773) 380-6606
Email: mmcdonnell@archventure.com

With a mandatory copy, which shall not constitute notice, to:

Proskauer Rose LLP
One International Place
Boston, MA 02110
Attn: Ori Solomon
Phone: (617) 526-9889
Fax: (617) 526-9899
Email: osolomon@proskauer.com

958

**IN WITNESS WHEREOF,** the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

**INVESTORS:**

**APPLIED VENTURES, LLC**

By: _Hn G C_

Name: _Hann-Ching Chao_

Title: _General Manager_

Address for notices:

_3225 Oakmead Village Drive_

_Santa Clara, CA 95052_

Phone: _(408) 986 3837_

Fax: _____

Email: _tony_chao @ amat.com_

959

**IN WITNESS WHEREOF**, the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

**INVESTORS:**

**ASSET MANAGEMENT VENTURES FUND, L.P.**

By: _____

Name: _Richard Simoni_____

Title: _Managing Member _____

Address for notices:

Asset Management Ventures
Attn: Rich Simoni
2100 Geng Road, Suite 200
Palo Alto, CA 94303
Phone: (650) 621-8808
Fax:
Email: rich@assetman.com

**IN WITNESS WHEREOF**, the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

**INVESTORS:**

**JOHN V. BAUTISTA**

By: _John V Bautista_

Name: _JOHN V. BAUTISTA_

Title: _____

Address for notices: _1000 MARSH ROAD_
_MENLO PARK CA 94025_

_____  _____

_____

Phone: _____

Fax: _____

Email: _____

# 2.1457
×1,722 shares = 3,694.90

961

**IN WITNESS WHEREOF,** the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

**INVESTORS:**

**BIOMATICS CAPITAL PARTNERS, L.P.**

By: _____

Name: ___Julie Sunderland_____

Title: ___Managing Director_____

Address for notices:

_____719 2nd Avenue, Suite 1402_____

_____Seattle, WA 98104_____

Phone: ___206-240-3943_____

Fax: _____

Email: ___julie@biomaticscapital.com_____

[Signature Page to Series D Stock Purchase Agreement]

**IN WITNESS WHEREOF**, the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

**INVESTORS:**

By: _____

Name: __CHAIM FRIEDMAN (TRUST) LTD__

Title: __Chaim Friedman, Director__

Address for notices:

__25 HABARZEL ST__

__TEL AVIV 69710 ISRAEL__

Phone: __+972544214440__

Fax: _____

Email: __chaim@lionbird.com__

[Signature Page to Series D Stock Purchase Agreement]

IN WITNESS WHEREOF, the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

INVESTORS:

CORMORANT GLOBAL HEALTHCARE MASTER FUND, LP

By: Cormorant Global Healthcare GP, LLC

By: _____

Name:  Bihua Chen

Title:  Managing Member of the GP

Address for notices:

200 Clarendon Street 52nd Floor
Boston MA 02116

964

**IN WITNESS WHEREOF**, the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

**INVESTORS:**

**CORMORANT PRIVATE HEALTHCARE FUND I, LP**

By: Cormorant Private Healthcare GP, LLC

By: _____

Name:  Bihua Chen

Title:  Managing Member of the GP

Address for notices:

200 Clarendon Street 52nd Floor
Boston MA 02116

965

**IN WITNESS WHEREOF,** the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

**INVESTORS:**

**CRMA SPV, LP**

By: Cormorant Asset Management, LLC

By: _____

Name:  Bihua Chen

Title:  Managing Member of the Special Limited Partner

Address for notices:

PO Box 309
Ugland House
Grand Cayman
KY1-1104 Cayman Islands

966

**IN WITNESS WHEREOF**, the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

**INVESTORS:**

By: _____

Name: _____Edward L. Michael_____

Title: _____Trustee_____

Address for notices:

_____618 Sheridan Square, #2_____

_____Evanston IL 60202_____

Phone: _____847-721-2171_____

Fax: _____

Email: _____Ed@lionbird.com_____

[Signature Page to Series D Stock Purchase Agreement]

**IN WITNESS WHEREOF**, the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

**INVESTORS:**

**FOUNDRY SQUARE INVESTORS - XVII, LLC**

By: _____

Name: _____

Title: _____

Address for notices:

_____

_____

Phone: _____

Fax: _____

Email: _____

**IN WITNESS WHEREOF,** the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

INVESTORS:

HARMONIC GRACE LIMITED

By: _____

Name: John Wu

Title: Director

Address for notices:

c/o 3W Partners Capital (HK) Limited
Suites 3407-09, 34/F, Jardine House
1 Connaught Place, Central, Hong kong

Phone: +852 3101 9888

Fax: +852 3189 3000

Email: Project.Spring@3wpcap.com

[Signature Page to Series D Stock Purchase Agreement]

969

IN WITNESS WHEREOF, the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

INVESTORS:

ILLUMINA, INC.

By: _____

Name: _____
Jeffrey S. Eidel
VP, Corporate & Business Development

Title: _____

REVIEWED BY LEGAL
Initials: _____
Date: _____
ILLUMINA

**IN WITNESS WHEREOF**, the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

**INVESTORS:**

MANHATTAN TRUST

By: _____

Name: ___Andrew J Robbins_____

Title: ___Trustee_____

Address for notices:

_____1624 Fourth Ave STE 400_____

_____Seattle, WA 98101_____

Phone: ___(212) 863-9798_____

Fax: _____

Email:___manhattantrust@yahoo.com_____

[Signature Page to Series D Stock Purchase Agreement]

971

**IN WITNESS WHEREOF**, the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

INVESTORS:

**MERIEUX PARTICIPATIONS SAS**

By: _____

Name: ___ F. VALENCONY ___

Title: ___ General Manager, Merieux Develeppement
President Merieux Participations SAS ___

Address for notices:

___ 17 rue Bourgelat ___
___ 69002 Lyon
FRANCE ___

Phone: ___ +33 478 87 3700 ___

Fax: _____

Email: ___ reporting@merieux-developpement.com ___

**IN WITNESS WHEREOF**, the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

**INVESTORS:**

**NANODIMENSION II LIMITED PARTNERSHIP**

By: _____

Name:  Jonathan Nicholson

Title:  Executive Director

Address for notices:

  Governor's Square, Unit 3-213

  23, Lime Tree Bay Ave, Grand Cayman, Cayman Islands

Phone:  (345) 516-0210

Fax: _____

Email:  jonathan@nanodimension.com

973

IN WITNESS WHEREOF, the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

INVESTORS:

By:

Name:  Shlomo Nevo

Title:  Mr.

Address for notices:

Unit 27-02, Prasanmitr Thani Tower, 41 Sukhumvit Soi 23

Bangkok, 10110, Thailand

+66-85-1250260
Phone:

Fax:

dsnevo@gmail.com
Email:

[Signature Page to Series D Stock Purchase Agreement]

974

**IN WITNESS WHEREOF**, the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

**INVESTORS:**

NFX R2, LLC

By: _____

Name: _____Jaames Currier_____

Title: _____Managing Member_____

Address for notices:

__558 Hawthorne, Palo Alto, CA  94301__

_____

Phone: ____415-269-5282_____

Fax: _____

Email:___james@nfx.com and cc: jeff@nfx.com

[Signature Page to Series D Stock Purchase Agreement]

975

**IN WITNESS WHEREOF,** the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

INVESTORS:

**PROSAIC GROWTH FUND, LLC**

By: _____

Name: _Eric Shapou_____

Title: _CFO Progeny 3 Inc (Manager)_

Address for notices:

_601 Union St., Suite 3920_____

_Seattle, WA 98101_____

Phone: _206-654-3514_____

Fax: _206-654-3566_____

Email: _edward.swifty@progenythree.com_

976

**IN WITNESS WHEREOF**, the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

INVESTORS:

**TAO INVEST LLC, A DELAWARE LIMITED LIABILITY COMPANY**

By: _____

Name: Nicholas J. Pritzker _____

Title: Manager _____

Address for notices:
c/o Tao Capital Partners LLC
Attn: Matt Bigliardi
1 Letterman Drive
Building C, Suite 420
San Francisco, CA 94129
Phone: (415) 549-4986
Email: mbigliardi@taocap.com

**IN WITNESS WHEREOF,** the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

**INVESTORS:**

**THE CRAVES FAMILY FOUNDATION**

By: _Fred Craves_

Name: _Fred Craves_

Title: _Manager_

Address for notices:

_750 Battery St  Ste 400_

_San Francisco CA 94111_

Phone: _415  528  1743_

Fax: _____

Email: _fred@cdsp.com_

978

IN WITNESS WHEREOF, the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

### INVESTORS:

By: _____

Name: Gigi Levy-Weiss

Title: _____

Address for notices:

52 Harmon St.

Ramat Hasharon, Israel, 47251

Phone: +972542428888

Fax: _____

Email: gigi@nfx.com

[Signature Page to Series D Stock Purchase Agreement]

Doc ID: ac8d44c6f55af0b47a87a1688b8689daec0d480c

**IN WITNESS WHEREOF**, the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

**INVESTORS:**

**FAY XING**

By: _____

Address for notices:

_____

_____

Phone: _____

Fax: _____

Email: _____

[Signature Page to Series D Stock Purchase Agreement]

980

**IN WITNESS WHEREOF**, the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

**INVESTORS:**

By: _____

Name: Itschak Friedman

Title: _____

Address for notices:

_____

_____

Phone: _____

Fax: _____

Email: _____

[Signature Page to Series D Stock Purchase Agreement]

981

**IN WITNESS WHEREOF,** the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

**INVESTORS:**

**ILLUMINA INNOVATION FUND I, L.P.**

by: Illumina Innovation Fund I GP, L.L.C.

its: General Partner

By: _____

Name: Nicholas Naclerio

Title: Managing Member

982

IN WITNESS WHEREOF, the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

INVESTORS:

**WUXI HEALTHCARE VENTURES II, L.P.**

By: WUXI HEALTHCARE MANAGEMENT, LLC, its General Partner

By: _____

Name: Wei Li

Title: Director

[Signature Page to Series D Stock Purchase Agreement]

983

**IN WITNESS WHEREOF**, the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

**INVESTORS:**

**VITAL TWIST INVESTORS LLC**

By: _____

Name:  Craig Asher

Title:  Manager

Address for notices:

c/o Vital Venture Capital
7101 Wisconsin Avenue, Suite 1210
Bethesda, MD 20814
Attn: Craig Asher

**IN WITNESS WHEREOF,** the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

**INVESTORS:**

JONATHAN DONG

By: _____Dong Feng_____

Address for notices:

_318 Hu Nan Road,_

_Shanghai, 200031, China_

Phone: _(86) 138-1680-8266_

Fax: _(8621) 6437-8580_

Email: _jonathan@mcm.china.com_

[Signature Page to Series D Stock Purchase Agreement]

**IN WITNESS WHEREOF**, the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

**INVESTORS:**

**CAPITAL FORTUNE VENTURES LIMITED**

For and on behalf of
CAPITAL FORTUNE VENTURES LIMITED

By: _____

Authorized Signature(s)

Name: Sun Xintong & Leung Wei Ping Ronald

Title: Directors

Address for notices:

c/o 23rd, Nan Fung Tower,

88Connaught Road C., Central, Hong Kong

Phone: +852 2521 7417

Fax: + 852 3162 5618

Email: psupport@nftcapital.com

[Signature Page to Series D Stock Purchase Agreement]



**IN WITNESS WHEREOF,** the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

**INVESTORS:**

**REINET COLUMBUS LIMITED**

By: _____
(Signature)

Name:   N. M<sup>c</sup> CALLUM

Title: Director

By: _____
(Signature)

Name:   L. CROSBY

Title: Director

[Signature Page to Series D Stock Purchase Agreement]

**IN WITNESS WHEREOF**, the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

**INVESTORS:**

**PETER LAMB**

By: _____

Address for notices:

_01241 SW Mary Failing Drive_
_Portland, OR  97219_

Phone: _650-464-3791_

Fax: _N/A_

Email: _plamb@orrick.com,_
      _copy to: mark.bernazzani@brightonjones.com_

[Signature Page to Series D Stock Purchase Agreement]

988

**IN WITNESS WHEREOF**, the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

**INVESTORS:**

**CHRISTOPHER AUSTIN**

By: _____

Address for notices:

28 Washington Ave
Wockport CT 06880

Phone: _____

Fax: _____

Email:_____

[Signature Page to Series D Stock Purchase Agreement]

989

IN WITNESS WHEREOF, the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

**INVESTORS:**

**DITCH PLAINS PRIVATE VENTURES VII, LLC.**

By: _Bofak_

Name: HANSOO KIM

Title: MANAGING MEMBER

Address for notices:

19 ORCHARD ST.

MANHASSET, NY 11030

Phone: 516 - 627 - 6202

Fax: 516 - 627 - 6204

Email: HANSOOJKIMOGMAIL.COM

[Signature Page to Series D Stock Purchase Agreement]

990

**IN WITNESS WHEREOF**, the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

**INVESTORS:**

**PALADIN III, L.P.**

By:  Paladin Holdings III, L.P.
By:  Paladin Capital Group III, LLC, its General Partner

By: _____
Name: Michael R. Steed
Title: an Authorized Person

**PALADIN III (Cayman Islands), L.P.**

By: Paladin Holdings III (Cayman Islands), L.P.
By: Paladin Homeland Security Corporation III, Ltd., its General Partner

By: _____
Name: Michael R. Steed
Title: an Authorized Person

**PALADIN III (NY City), L.P.**

By:  Paladin Holdings III, L.P.
By:  Paladin Capital Group III, LLC, its General Partner

By: _____
Name: Michael R. Steed
Title: an Authorized Person

**PALADIN III (HR), L.P.**

By:  Paladin Holdings III, L.P.
By: Paladin Capital Group III, LLC its General Partner

By: _____
Name: Michael R. Steed
Title: an Authorized Person

**IN WITNESS WHEREOF**, the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

**INVESTORS:**

**PALADIN III (CA), LP**

By:  Paladin Holdings III, L.P.
By: Paladin Capital Group III, LLC its General Partner

By: _____
Name: Michael R. Steed
Title: an Authorized Person

**PALADIN III CO-INVESTMENT, LLC**

By:  Paladin Holdings III, L.P., its Managing Member
By:  Paladin Capital Group III, LLC, its General Partner
By:  200 H Ave. Investments, LLC, its Managing Member

By: _____
Name: Michael R. Steed
Title: an Authorized Person

Address for Notices:

Patrice Rainier – Director, Investor Relations
c/o Paladin Capital Group
2020 K Street, NW – Suite 400
Washington, DC  20006

IN WITNESS WHEREOF, the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

**INVESTORS:**

**AME CLOUD VENTURES, LLC**

By:

Name: Greg Hardester

Title: Manager

Address for notices:

720 University Ave, Suite 200
Los Gatos, CA 95032

[Signature Page to Series D Stock Purchase Agreement]

**IN WITNESS WHEREOF**, the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

### INVESTORS:

By: _Chrclw_

Name: _Eric Anschutz_

Title: _____

Address for notices:

_497 Elizabeth St_

_San Francisco, CA 94114_

Phone: _415-641-1121_

Fax: _____

Email: _eric@uphealth.me_

[Signature Page to Series D Stock Purchase Agreement]

**IN WITNESS WHEREOF**, the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

INVESTORS:

**BAY CITY CAPITAL GF XINDE INTERNATIONAL LIFE SCIENCES USD FUND, L.P.**

By: *Fred Craves*

Name: _Fred Craves_

Title: _Director_

Address for notices:

_750 Battery Street, Suite 400_

_San Francisco, CA 94111_

Phone: _415 - 835 - 9340_

Fax: _415 - 837 - 0303_

Email: _fred @ baycitycapital . com_

[Signature Page to Series D Stock Purchase Agreement]

995

**IN WITNESS WHEREOF**, the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

INVESTORS:

FENG DONG

By: _Dong Feng_

Name:  Feng Dong

Address for notices:

318 Hu Nan Road,

Shanghai, 200031, China

Email: jonathan@mcmchina.com

[Signature Page to Series D Stock Purchase Agreement]

996

**IN WITNESS WHEREOF**, the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

**INVESTORS:**

**JUMP WINNER INVESTMENTS LTD.**

By:  _____

Name:  Zhonglin Lu

Title:  Executive Director

Address for notices:

188 Zi Xia Rd, Bldg 18-3-1401
Hangzhou, Zhejiang, 31000
CHINA

[Signature Page to Series D Stock Purchase Agreement]

997

**IN WITNESS WHEREOF**, the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

INVESTORS:

**RISE HUGE CORPORATION LIMITED**

By: _____

Name: _CHAN, SIU MUK_

Title: _Director_

Address for notices:

FLAT/RM 05-06 21/F
OFFICE TOWER LANGHAM PLACE
8 ARGYLE STREET
MONGKOK KL
HONG KONG

[Signature Page to Series D Stock Purchase Agreement]

**IN WITNESS WHEREOF**, the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

INVESTORS:

SICAV PATRIMOINE INVESTISSEMENTS-FLEXIGLOB

By: _____

Name: _____

    Mike KARA / Frédéric FASEL

Title: _____

    Director   /   Director

Address for notices:

15 avenue J.F Kennedy
_____

L-1855 Luxembourg
Grand-Duchy of Luxembourg
_____

Phone: +352.46.71.71.78.32 (Alexandre DECK - Private Equity Investment Services Officer - FundPartner Solutions (Europe) S.A)

    +423.238.1475 (Christian BOLLETER - Asset Manager, FIDARES AM AG

Fax: _____

Email: InvestmentServices_PERE@pictet.com

    private-equity@pictet.com

    cbolleter@fidares-trust.li

Number of shares : 466,048.00

[Signature Page to Series D Stock Purchase Agreement]

999

**IN WITNESS WHEREOF,** the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

**INVESTORS:**

**WATSON AND CRICK LIMITED**

By: _____

Name: _James Christopher Kralik_

Title: _Director_

Address for notices:

_318 Hunan Road, Xuhui District_

_Shanghai 200031, China_

Phone: _+86-21-6437 9190_

Fax: _+86-21-6437 9590_

Email: _james kralik @ yahoo.com_

[Signature Page to Series D Stock Purchase Agreement]

1000

**IN WITNESS WHEREOF**, the undersigned have executed this Series D Preferred Stock Purchase Agreement as of the day and year first above written.

**INVESTORS:**

**ZHONGLIN LU**

By: _____

Name: _____Zhonglin Lu_____

Title: _____Executive Director_____

Address for notices:

188 Zi Xia Rd, Bldg 18-3-1401
Hangzhou, Zhejiang, 31000
CHINA

[Signature Page to Series D Stock Purchase Agreement]

**SCHEDULE A**
**Purchased Shares**

| Investor | Series D Shares | Purchase Price | Closing Date |
|---|---|---|---|
| Alexandria Equities, LLC | 42,093 | $90,318.96 | March 9, 2017 |
| Anschutz, Eric | 713 | $1,529.89 | May 19, 2017 |
| Applied Ventures, LLC | 39,630 | $85,034.10 | March 9, 2017 |
| ARCH Venture Fund VII, L.P. | 468,030 | $1,004,251.98 | March 9, 2017 |
| ARCH Venture Fund VIII Overage, L.P. | 1,862,211 | $3,995,746.15 | March 9, 2017 |
| Asset Management Ventures | 122,673 | $263,219.46 | March 9, 2017 |
| Bautista, John | 1,722 | $3,694.90 | March 9, 2017 |
| Biomatics Capital Partners, L.P. | 2,330,241 | $4,999,998.12 | March 9, 2017 |
| Chaim Friedman (Trust) Ltd. | 2,846 | $6,106.67 | March 9, 2017 |
| Cormorant Global Healthcare Master Fund, LP | 444,377 | $953,499.73 | March 9, 2017 |
| Cormorant Private Healthcare Fund I, LP | 1,794,752 | $3,850,999.37 | March 9, 2017 |
| CRMA SVP, L.P. | 91,112 | $195,499.02 | March 9, 2017 |
| Edward L. Michael Trust | 2,846 | $6,106.67 | March 9, 2017 |
| Foundry Square Investors - XVII, LLC | 27,030 | $57,998.28 | March 9, 2017 |
| Friedman, Itschak | 4,743 | $10,177.06 | March 9, 2017 |
| Harmonic Grace Limited | 2,330,241 | $4,999,998.12 | March 9, 2017 |
| Illumina Innovation Fund I, L.P.. | 127,428 | $273,422.26 | March 10, 2017 |
| Illumina, Inc. | 1,556,590 | $3,339,975.17 | March 9, 2017 |
| Manhattan Trust | 15,000 | $32,185.50 | March 16, 2017 |
| Merieux Participations SAS | 932,096 | $1,999,998.39 | March 9, 2017 |
| NanoDimension II Limited Partnership | 237,778 | $510,200.26 | March 9, 2017 |
| Nevo, Shlomo | 12,212 | $26,203.29 | March 9, 2017 |
| NFX R2, LLC | 4,660 | $9,998.97 | March 9, 2017 |
| Prosaic Growth Fund, LLC | 932,096 | $1,999,998.39 | March 9, 2017 |
| Vital Twist Investors LLC | 93,033 | $199,620.91 | March 27, 2017 |
| Paladin III (CA), LP | 32,232 | $69,160.21 | May 3, 2017 |
| Paladin III (Cayman Islands), LP | 64,893 | $139,240.92 | May 3, 2017 |
| Paladin III (HR), LP | 32,232 | $69,160.21 | May 3, 2017 |
| Paladin III (NY City), LP | 94,487 | $202,740.76 | May 3, 2017 |
| Paladin III Co-Investment, LLC | 13,738 | $29,477.63 | May 3, 2017 |
| Paladin III, LP | 111,952 | $240,215.41 | May 3, 2017 |
| Tao Invest LLC, A Delaware Limited Liability Company | 1,196,815 | $2,568,005.95 | March 9, 2017 |
| The Craves Family Foundation | 38,044 | $81,631.02 | March 9, 2017 |
| Weiss, Gigi Levy | 2,846 | $6,106.67 | March 9, 2017 |
| WuXi Healthcare Ventures II, L.P. | 383,661 | $823,221.41 | March 9, 2017 |
| Xing, Fay | 1,186 | $2,544.81 | March 10, 2017 |
| Capital Fortune Ventures Limited | 3,495,363 | $7,500,000.39 | May 3, 2017 |
| Reinet Columbus Limited | 2,330,241 | $4,999,998.12 | May 3, 2017 |
| Watson and Crick Limited | 932,096 | $1,999,998.39 | May 18, 2017 |
| Dong, Jonathon | 93,209 | $199,998.56 | May 3, 2017 |
| Cambridge Twist, LLC | 46,604 | $99,998.21 | |
| Ditch Plains Private Ventures VII, LLC | 116,512 | $249,999.80 | May 3, 2017 |
| Bautista, John | 9,320 | $19,997.93 | May 3, 2017 |
| Foundry Square Investors - XVII, LLC | 23,302 | $49,999.11 | May 3, 2017 |
| Austin, Christopher | 6,990 | $14,998.45 | May 3, 2017 |
| Lamb, Peter | 6,990 | $14,998.45 | May 3, 2017 |
| AME Cloud Ventures, LLC | 69,907 | $149,999.45 | May 3, 2017 |
| SICAV Patrimoine Investissements-Flexiglob | 466,048 | $999,999.20 | May 9, 2017 |
| Jump Winner Investments Ltd. | 163,116 | $349,998.01 | |
| Van Veenendaal Revocable Trust | 93,209 | $199,998.56 | |
| Kevin Johnson | 46,604 | $99,998.21 | |
| Arch F. Meredith III | 93,209 | $199,998.56 | |
| Robert L. Falkenberg III 1999 Grantor Retained Annuity Trust | 93,209 | $199,998.56 | |
| Marc Lobnek | 466,048 | $999,999.20 | |

| | | | |
|---|---|---|---|
| E Squared Capital | 932,096 | $1,999,998.39 | |
| Bay City Capital GF Xinde International Life Sciences USD Fund, L.P. | 466,048 | $999,999.20 | May 25, 2017 |
| Rise Huge Corporation Limited | 4,427,459 | $9,499,998.78 | May 30, 2017 |
| | | | |
| **Total:** | | | |

**<u>Schedule B</u>**

Wire Transfer Instructions

## Exhibit A

Amended and Restated Certificate of Incorporation

**Exhibit B**

Amendment to Amended and Restated Stockholders Agreement

**Exhibit C**

Amendment to Amended and Restated Registration Rights Agreement

**Exhibit D**

Opinion of Company Counsel